# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| DAVID ROLLINS, | |
| *Plaintiff,* | Civil Action No: 16-cv-04542 (PGS)(TJB) |
| v. | |
| NATIONAL RAILROAD PASSENGER CORP. d/b/a AMTRAK, | **MEMORANDUM AND ORDER** |
| *Defendant.* | |

SHERIDAN, U.S.D.J.

This matter comes before the Court on a motion for summary judgment [ECF No. 36] filed by Defendant the National Railroad Passenger Corporation d/b/a Amtrak.

I.

Plaintiff, David Rollins, a former employee of Amtrak, argues that he was unlawfully terminated from his employment. Plaintiff was employed with Amtrak for nearly 23 years, until August 4, 2015. (Second Amend Compl., ECF No. 25, ¶8). He was a supervisor for at least 10 years and his last position was the "night shift supervisor at the Adams Maintenance of Way Base located in North Brunswick, NJ," (track supervisor)[1] (Id.; Rollins Depo. T. 29:21). In that position, Plaintiff was responsible for overseeing approximately twenty employees performing track maintenance. (Rollins Depo. T. 44:14-25). The position required coordination with the track

---

[1] This is a union position covered by a collective bargaining agreement between Amtrak and the American Railway and Airway Supervisors Association (ARASA).

1

maintenance team and supervisor who worked on the day shift to ensure continuity of work. (Rollins Depo T45:1-47:25).

In March 2015, Josh Newbold, an assistant day supervisor, was temporarily assigned to act as the day supervisor while the usual supervisor was on vacation. The transition did not proceed smoothly as there was tension between Plaintiff and Newbold in coordinating the management of the railway. (Second Amend. Comp., ¶10).

Sometime after the switch from the day to the night shift, Plaintiff reported to his supervisor, John Semliatschenko, Assistant Division Engineer, that there was a problem with Newbold due to insufficient coordination, and that he was concerned about the safety during his shift. Plaintiff requested that a meeting be arranged to address his concerns. (Id., ¶11). A meeting was arranged on March 12, 2015, between Plaintiff, Newbold, and Semliatschenko, who was to function as a mediator. (Id., ¶12). At the meeting, a very vocal argument erupted between Plaintiff and Newbold. Semliatschenko left the room for a few minutes, and upon his return he terminated the meeting. (Id., ¶13). While Semliatschenko was not present, Plaintiff allegedly threatened Newbold. Newbold did not immediately report the threat, because he concluded that Plaintiff was not serious about hurting him. (Newbold Depo., Adams Cert. Ex. I, T. 14:2-4).

On April 23, 2015, Plaintiff placed a call to "Operation RedBlock," – an Employee Assistance Program (EAP) helpline - to speak with a counselor or mental healthcare professional. (Second Amend. Compl., ¶14; Rollins Depo. T. 56:6-12)[2]. At the time, Plaintiff, was dealing with

---

[2] As explained in Defendant's brief, Operation RedBlock is a "labor-developed, Amtrak adopted, drug and alcohol prevention and intervention program. Employees who are experiencing issues related to drug and/or alcohol abuse are able to reach out to Operation RedBlock personnel confidentially to seek assistance and, if needed, to be excused from work."(Def. Br. pg. 6 Fn 4).

work related stress, marital issues, and his son was undergoing cancer treatment. (Rollins Depo. T. 60-61).

Later that night, while Plaintiff was at his duty station, Plaintiff was approached by Amtrak Police and paramedics from the local hospital and asked whether he was contemplating suicide. Rollins denied same, and explained that he was having work and marital problems, but not contemplating suicide. Notwithstanding his response, he was taken to a local hospital for evaluation. Plaintiff was later released and determined not to have had suicidal thoughts and that he was not a danger to the railroad. (Amend. Compl. ¶15). Nevertheless, he was placed on medical leave, pending clearance to return to work. (Rollins Depo. T. 138:15-139:24).

The next day, when Newbold arrived at work, he learned from co-workers about the intervention between Amtrak Police and Plaintiff the previous evening, and he became concerned about Plaintiff's emotional stability and fearful of the threats Plaintiff had made to him on March 12, 2015, and he reported the incident. (*See* Adams Cert. Ex. L, Incident/Investigation Report). Consequently, Semliatschenko decided to contact Amtrak Police pursuant to Amtrak rules related to workplace violence especially in light of Newbold's concerns. (Semliatschenko Depo., Adams Cert Ex. L, T34:13-17, 35:8-21). Amtrak Police conducted an investigation and asked Newbold to submit a statement of what occurred. It stated that on March 12, 2015, Plaintiff had threatened him with bodily harm when he stated that "he would come down to Levittown [] and slide one in me."[3] There were no witnesses present when the incident occurred. (Newbold Statement, Adams's Cert. Ex K; Second Amend. Compl. ¶16).

Amtrak Police generated a report of the complaint. (Adams Cert., Ex. L). Plaintiff denied making such a threat. (Amend. Compl., ¶17).

---

[3] "Slide one in" a slang term that Newbold believes to mean to stab a person with a knife or some sharpened instrument.

3

Plaintiff, who had been placed on a medical leave and was seeing a counselor after the EAP/help line incident, was cleared to return to work in July 2015, so long as he provided documentation of continued care with a counselor to include at least 2 visits every 30 days until decreased or released by the counselor. (ECF No. 37-8 Plaintiff's medical record, pg. 3). In his evaluation e-mail, on June 30, 2015, Dr. Robert L. Tanenbaum, who spoke to Plaintiff's counselor, agreed that Plaintiff "appear[ed] to be emotionally stable. When he reached out for telephone assistance, he may have unintentionally created a higher level of concern about his wellbeing than he anticipated. That said I find him fit for his duties." (Id., pg. 5).

After a brief period (length unclear) of returning to work, Plaintiff was again removed from work pending investigation on the Newbold incident. (Rollins Depo. T138:15-139:24).

On August 10, 2015, an investigatory hearing was held before a neutral hearing officer, Christopher Stephens. (Adams Cert. Ex. J). At the hearing, Newbold testified that he had delayed reporting his complaint because "at the time, . . . [he] didn't think much about it. It was just a verbal altercation many that we had - - and didn't put much thought into it until some of the events that took place." This included the encounter between Amtrak Police and Plaintiff over his emotional state wherein Newbold noted "[Plaintiff] was going to try to somehow some way commit suicide." (Ex. J T. 40-41).

On August 20, 2015, Stephens sent Plaintiff a copy of the decision which terminated him from his employment. (Adams Cert. Ex. Q).

The decision identified the following charges:

(1) Violation of Amtrak's "Standard of Excellence" specifically in the context of the sections entitled Attending to Duties, and Professional and Personal Conduct.
(2) Violation of Amtrak's "Workplace Violence Policy," specifically in connection with the March 12, 2015 incident.

The Amtrak's "Standard of Excellence," "Attending to Duties" section states,

4

> . . . As an Amtrak employee and, therefore, the company's most important resource, you have an obligation to perform your duties properly and in accordance with the standard set for your particular job. This requires that you remain alert to your duties at all times. Any activity or behavior that distracts or prevents you or others from attending to duties is unacceptable.

The Professional and Personal Conduct section states:

> Teamwork: "Being polite to each other is one of the basis of teamwork, so it is important that we all are considerate and respectful of each other. Part of teamwork is properly performing your duties. Another part is following instructions. Therefore, you must comply with all company and department policies, procedures and rules as well as all instructions directions and orders from supervisors and managers. "
>
> Conduct: "On the Amtrak team, there is no place for activities or behaviors that compromise the safety, satisfaction and well-being of our customers, the public or our fellow employees. Therefore, boisterous conduct such h as fighting, rudeness, assault, intimidation, horseplay, and using profane or vulgar language is unacceptable."

The Amtrak's Workplace Anti-Violence Policy states:

> Amtrak has zero tolerance for threats and violence. Amtrak is committed to providing its employees a workplace free from acts or threats of violence and to effectively respond in the event that a workplace violence does occur.

The policy defines workplace violence as "any intentional verbal or physical conduct affecting the workplace that causes any individual to reasonably fear for his or her personal safety, the safety of his or her family, friends, co-workers, and/or property." Among examples of workplace violence, the policy lists: physically or verbally threatening another individual, Threatening physical harm or similar intimidation either directly or indirectly, threatening or attempting to commit suicide. Under the "Discipline" heading of the same section, the policy states,

> Any person who exhibits threatening behavior, threatens to commit and/or actually commits a violent act on Company property may be removed from the worksite as quickly as safety permits, and may be asked to remain away from the worksite pending the outcome of an investigation into the incident conducted by the employee's supervisor or manager and/or the Amtrak Police Department.
>
> (Certification of Stacey D. Adams (Adam's Cert.) ECF No. 36-3, pg. 6-7, Ex. A).

Plaintiff appealed his termination to Amtrak's Labor Relations Department on September 8, 2015. (Adams Cert. Ex. S). On October 22, 2015, the Labor Relations Department upheld the findings of the Hearing Officer and the decision to terminate Plaintiff. The Union then appealed the Labor Relations Department's decision to the Public Law Board. (Adams Cert., Ex. R). On October 26, 2016, the Public Law Board denied the appeal and upheld the termination, finding that "the Carrier (Amtrak) has proven with sufficient probative evidence that the Claimant is guilty." (Id.)

Plaintiff filed his initial complaint on July 27, 2016, alleging violations of the Family Medical Leave Act of 1993 (FMLA), the American with Disabilities Act of 1990 (ADA), and the New Jersey Law against Discrimination (NJLAD). [ECF No. 1]. Overall, Plaintiff alleges that his termination was a pretext for unlawful discrimination because he was perceived as having a mental disability that would impair his ability to work, and for the exercising of his right to family medical leave under FMLA. (Id. ¶20). In the Second Amended Complaint, Plaintiff includes the following Counts:

| | |
|---|---|
| Count I: | Unlawful discrimination under FMLA |
| Count II: | Unlawful discrimination under New Jersey Family Leave Act (NJFLA) |
| Count III: | Unlawful discrimination under the Rehabilitation Act, 29 U.S.C. § 701 et seq. (RA) |
| Count IV: | Unlawful discrimination under NJLAD |

On September 5, 2017, this Court dismissed Count I and II upon Plaintiff's request. [ECF No. 32]. Defendant now moves for summary judgment on the remaining counts, Count III and Count IV, for Plaintiff's failure to establish a prima facie case, or prove that Defendant's reason for terminating him was a pretext. [ECF No. 36].

II.

Summary judgment is appropriate under Fed. R. Civ. P. 56(c) when the moving party demonstrates that there is no genuine issue of material fact and the evidence establishes the moving party's entitlement to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). A factual dispute is genuine if a reasonable jury could return a verdict for the non-movant, and it is material if, under the substantive law, it would affect the outcome of the suit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence; instead, the non-moving party's evidence "is to be believed and all justifiable inferences are to be drawn in his favor." *Marino v. Indus. Crating Co.*, 358 F.3d 241, 247 (3d Cir. 2004) (quoting *Anderson*, 477 U.S. at 255).

Once the moving party has satisfied its initial burden, the party opposing the motion must establish that a genuine issue as to a material fact exists. *Jersey Cent. Power & Light Co. v. Lacey Twp.*, 772 F.2d 1103, 1109 (3d Cir. 1985). The party opposing the motion for summary judgment cannot rest on mere allegations and instead must present actual evidence that creates a genuine issue as to a material fact for trial. *Anderson*, 477 U.S. at 248; *Siegel Transfer, Inc. v. Carrier Express, Inc.*, 54 F.3d 1125, 1130-31 (3d Cir. 1995). "[U]nsupported allegations . . . and pleadings are insufficient to repel summary judgment." *Schoch v. First Fidelity Bancorp.*, 912 F.2d 654, 657 (3d Cir. 1990); *see also* Fed. R. Civ. P. 56(e) (requiring nonmoving party to set forth specific facts showing that there is a genuine issue for trial"). Moreover, only disputes over facts that might affect the outcome of the lawsuit under governing law will preclude the entry of summary judgment. *Anderson*, 477 U.S. at 247-48. If a court determines, after drawing all inferences in favor of [the non-moving party], and making all credibility determinations in his favor "that no

reasonable jury could find for him, summary judgment is appropriate." *Alevras v. Tacopina*, 226 Fed. App'x. 222, 227 (3d Cir. 2007).

III.

Defendant argues that Plaintiff failed to establish a prima facie claim of disability and discrimination under either NJLAD or the Rehabilitation Act[4]. (Def. Br, pg. 12). *See Lopez v. Lopez*, 997 F. Supp.2d 256, 272 (D.N.J. 2014),

> Both the ADA and RA bar an entity that receives federal funding. . . .from discriminating against an individual on account of that individual's disability. *See McDonald v. Pennsylvania*, 62 F.3d 92, 95 (3d Cir. 1995). Similarly, the NJLAD prohibits "any place of public accommodation" from refusing to any individual, on account of, inter alia, that individual's disability, the right "to obtain all the accommodations, advantages, facilities and privileges" of that public entity. N.J.S.A. § 10:5-4.

*Chin v. Rutgers*, 2016 U.S. Dist. LEXIS 61438, *15-16 (May 9, 2016). Discrimination claims under NJLAD and the Rehabilitation Act follow the same analysis. *See Lopez*, 997 F. Supp.2d at 272 ("Discrimination claims pursuant to the LAD . . . follow the *McDonnell Douglas* burden-shifting paradigm"); *Berry v. Lombardi*, 2005 U.S. Dist. LEXIS 24535, *28 (D.N.J. Oct. 13, 2005) ("The rights and remedies under the Rehabilitation Act are the same as with the ADA. . . Identical standards [are] to be applied to both Acts."); *Chisolm v. McManimon*, 275 F.3d 315, 324 n.9 (3d Cir. 2001) (supporting that the standards for determining a violation of the RA and NJLAD are the same as those under the ADA.)

The applicable framework is the *McDonnell-Douglas* burden shifting framework set forth by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), and later clarified in *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248 (1981), and *St. Mary's Honor*

---

[4] Defendant did not move to dismiss one count because only the other applied.

8

*Ctr. v. Hicks*, 509 U.S. 502 (1993); *see also Schurr v. Resorts Int'l Hotel, Inc.*, 196 F.3d 486, 498 (3d Cir. 1999). The framework consists of three steps. First, a plaintiff must present sufficient evidence to support a prima facie case of discrimination. *Hicks*, 509 U.S. at 506. Once the plaintiff establishes a prima facie case, the burden of production then shifts to the defendant, who must articulate a legitimate, nondiscriminatory reason for its actions. *Id.* at 507; *Burdine*, 450 U.S. at 254; *McDonnell Douglas*, 411 U.S. at 802.

If the defendant satisfies this burden, the reviewing court must proceed to the third step. At this stage, the burden of production shifts back to the plaintiff who must come forward with admissible evidence showing that the defendants" articulated, nondiscriminatory reasons were not the true reasons for the adverse action, but merely a "pretext for discrimination." *Hicks*, 509 U.S. at 507-08; *Burdine*, 450 U.S. at 253.

Although the evidentiary burden shifts between the plaintiff and the defendants, the "ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Burdine*, 450 U.S. at 253. Here, defendant argues Newbold (a co-employee) may have had discriminatory animus against Plaintiff, but Amtrak did not

To establish a prima facie case, the plaintiff must show that (1) he is a member of a protected class; (2) he is qualified for the position in question; (3) he suffered from an adverse employment decision; and (4) the employer sought to or did fill the position with a similarly qualified person who was not a member of the protected class.

Plaintiff, as part of the prima facie case, must show that he is "qualified as an individual with a disability, or is perceived as having a disability, as defined by the statute." *Lopez*, 997 F.

Supp. 2d at 272. See also, *McDonnell Douglas*, 411 U.S. at 802.[5]

Defendant argues that in this case, Plaintiff cannot demonstrate that he was either disabled or "perceived as having a disability" by Amtrak. (Def. Br. pg. 13). To establish a perceived disability claim under the NJLAD, "the plaintiff must show that the employer entertained misperceptions about the plaintiff, . . . believing that the individual has a substantially limiting impairment that he or she does not have." *Myers v. Atl. Health Sys.*, 2017 U.S. Dist. LEXIS 7884, *17 (Jan.20, 2017) (citation omitted).

Plaintiff argues that he meets the criteria for disability because Amtrak perceived him as suffering from a mental disability by way of his call to Operation RedBlock and his discussion with a counsellor who alerted Amtrak Police (the alleged attempt to commit suicide) and then terminated Plaintiff's employment under a pretext that he engaged in an act of violence at his workplace. (Pl. Opp. pg. 7). In support of this claim, Plaintiff alleges temporal proximity of the dismissal process and his mental disability. That is, Newbold reported the threat to the Amtrak Police (six weeks after the event) and disclosed Plaintiff's possible suicidal tendencies at the workplace violence hearing. (Id.) Considering Newbold's delay in reporting, Amtrak's actions dramatically and quickly occurred after disclosure of Plaintiff's suicidal tendencies. (Newbold Depo 13:22-14:7). At Plaintiff's deposition, he identified Amtrak generally, and more specifically upper management and Semliatschenko as persons who discriminated against him. (Rollins Depo. T150:7-151:10.) The Defendant's argument that only a co-employee (Newbold) had discriminatory animus and not Amtrak management is a fact question since Amtrak management

---

[5] When applying the *McDonnell-Douglas* framework, the precise elements of the prima facie case vary based on the context of the case and were not intended as rigid or unbending. *Lynch v. Robertson*, 2007 U.S. Dist. LEXIS 60835, at *28-28 (W.D. Pa. Aug. 20, 2007) (citations omitted). The Third Circuit has indicated that the elements of the prima facie case are not universal and can be tailored to fit the specific context of the case. *Id.* at *28 (citations omitted).

instituted the dismissal process on workplace violence soon after management learned of Plaintiff's psychological disability, and discussions with a counselor that Amtrak retained. Based on the facts provided by the parties, one can plausibly argue that Newbold and Amtrak management were motivated by discriminatory animus. Defendant received Newbold's complaint for an alleged threat that occurred weeks prior thereto, the morning after Plaintiff's call to Operation RedBlock. A jury may determine that the request for psychological services was the motivation to seek Rollins' dismissal. The question to be resolved at this juncture is whether Defendant discriminated against Plaintiff "in permitting the discriminatory animus of one or more of Plaintiff's co-workers to influence [management's] decision to terminate Plaintiff." *Burlington*, 55 F. Supp. 3d at 741. This is a triable issue of fact.

Thus, motion for summary judgment is denied.

## ORDER

This matter, having been brought before the Court on Defendants' motion for summary judgment [ECF No. 36], and the Court having considered the briefs and submissions of the parties, and having heard oral argument;

IT IS on this 18th day of September, 2018;

**ORDERED** that Defendant's motion for summary judgment (ECF No. 36) is DENIED.

_____
PETER G. SHERIDAN, U.S.D.J.